**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **FABIAN SHAW, COLLINS KWABENA, DALE DUCLION, individually and on behalf of all others similarly situated,** | § § § § | |
| *Plaintiffs*, | § | |
| **v.** | § | **CIVIL ACTION NO.:**_____ |
| | § | |
| **HELIX ENERGY SOLUTIONS GROUP, INC.,** | § § | **CLASS ACTION** |
| *Defendant.* | § | **JURY DEMANDED** |
| | § § | |

---

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

---

Plaintiffs Fabian Shaw, Collins Kwabena, and Dale Duclion, individually and on behalf of all others similarly situated, by and through their attorneys, TB Robinson Law Group, PLLC, hereby file this Complaint against Defendant, Helix Energy Solutions Group, Inc. ("Helix" or "Defendant") and in support state as follows:

### I.    NATURE OF THE CLAIMS

1.  This is a class action, brought by Plaintiffs Fabian Shaw, Collins Kwabena and Dale Duclion (collectively, "the named Plaintiffs"), on behalf of themselves and other similarly situated individuals against the Defendant, Helix Energy Solutions Group, Inc. ("Helix" or "Defendant").

2.  Plaintiffs seek declaratory injunctive and other equitable relief, and compensatory and punitive damages, based on Defendant's discrimination and retaliation against the named Plaintiffs and members of a class of black employees, in violation of Title VII of the Civil Rights Act of

1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiffs also seek declaratory, injunctive and other equitable relief, and compensatory and punitive damages, based on Defendant's continuing deprivation of rights accorded to the named Plaintiffs and members of black employees (as defined herein in paragraph 35) under Section 1981 of the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. SS 1981 ("Section 1981").

3.  As evidence of Defendant's pattern and practice of race discrimination and retaliation, Plaintiffs allege the following specific examples of disparate treatment.

4. *Discrimination in Evaluations.* The performance evaluation system is implemented by managers exercising undue authority to make biased and inconsistent determinations with little or no oversight. This system permits discrimination on the basis of race in evaluations, where raises, bonuses, as well as further advancement within the company, are based on evaluations. Because of the undue discretion of managers/supervisors, Black employees receive lower evaluations than white employees. There is no factor (such as job grade, experience, or similar factors) that could explain this race-based difference.

5. *Discrimination in Promotions.* Helix's polices are not applied uniformly or fairly. Helix has a pervasive pattern and practice of systemic and continuing employment discrimination against blacks with respect to opportunities for advancement/leadership and promotions.

6. *Discrimination in Compensation.* Helix's polices are not applied uniformly or fairly. Helix has a pervasive pattern and practice of systemic and continuing employment discrimination against blacks with respect to compensation.

7. *Hostile Work Environment.* Helix has allowed employees to harass black employees on account of their race. The harassment and hostile work environment includes the use of racial slurs and offensive and derogatory remarks about black employees.

8. *Retaliation*. Helix has retaliated against black employees and at least one white employee who have reported racial discrimination in promotions and a race based hostile work environment.

9. This discrimination represents a company-wide pattern and practice, rather than a series of isolated incidents. Defendant's written and unwritten policies and practices regarding evaluations, promotions, and compensation subject the named Plaintiffs and the Class to ongoing disparate treatment. Helix's actions constitute a continuing violation of the rights of the named Plaintiffs and the Class, and have been ongoing since 2008, and prior to that date.

## II.    PARTIES

10. Plaintiff Fabian Shaw was employed as floor hand and assistant derrickman by Defendant from approximately July of 2015 through March of 2018. Plaintiff Shaw is, and at all relevant times herein was, an adult black male residing in Georgia.

11. Plaintiff Collins Kwabena was employed as a roughneck, floor hand, assistant derrickman, derrickman, and assistant driller by Defendant from approximately April of 2008 through September of 2017. Plaintiff Kwabena is, and at all relevant times herein was, an adult black male residing in Texas.

12. Plaintiff Dale Duclion was employed as a roustabout, floorhand, assistant derrickman, derrickman, assistant driller, and driller by Defendant from approximately August 2007 through January 2018. Plaintiff Duclion is, and at all relevant times herein was, an adult white male residing in Louisiana.

13. Defendant, Helix Energy Solutions Group Inc., is a for profit corporation organized under the laws of the state of Texas with its principal place of business located at 400 N. Sam Houston Parkway E, Suite 400, Houston, TX 77060. Helix may be served with process, including citation and a copy of this lawsuit, by serving Helix's registered agent for service of process, CT Corporation System, 1021 Main Street, Houston, TX 77002.

### III.   JURISDICTION & VENUE

14. Plaintiffs' claims arise under 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

15. Defendant employs the requisite number of employees for coverage under the relevant federal acts upon which Plaintiffs' claims are based.

16. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b). Defendant is headquartered in this District. Defendant set forth policies and practices that intentionally discriminated against black employees, and retaliated against individuals who reported said discrimination.

### IV.   ADMINISTRATIVE REMEDIES

17. Pursuant to Title VII of the Civil Rights Act of 1964, Plaintiffs, Shaw, Kwabena, and Duclion filed Charges of Discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiffs Shaw, Kwabena, and Duclion received their Right to Sue letters from the EEOC dated July 20, 2018. Plaintiffs have otherwise exhausted their administrative remedies.

### V.    BACKGROUND FACTS

#### DISCRIMINATION IN PROMOTIONS

18. Helix's polices are not applied uniformly or fairly. Helix has a pervasive pattern and practice of systemic and continuing employment discrimination against blacks with respect to, evaluations, opportunities for advancement/leadership and promotions, and compensation.

19. Helix regularly promoted less qualified white employees instead of more experienced and qualified black employees. Plaintiffs Shaw and Kwabena were both passed up for promotions in favor of less qualified and less experienced white employees.

20. In late 2016, Plaintiff Shaw was passed over for a promotion by another less qualified and experienced white male, Nick Coleman. And, in August 2017, Ethan Howard, a white floor hand, was promoted to assistant derrickman after Plaintiff Shaw had been promised the position by the rig superintendent, Mr. Danny Wilson.

21. On the Q5000 rig, Plaintiff Kwabena was passed up for a promotion from assistant derrickman to derrickman by a less qualified white man, Brandon West.

#### HOSTILE WORK ENVIRONMENT

22. Helix has allowed employees to harass black employees on account of their race. The harassment and hostile work environment included the use of racial slurs and offensive and derogatory remarks about black employees.

23. Plaintiff Kwabena was called a "nigger" and a "damn nigger" and told to "go be segregated" with Plaintiff Shaw.

24. Plaintiff Shaw was singled out by a known racist and treated as less than human. In one instance the known racist kicked tools toward Mr. Shaw but treated white employees with dignity and respect.  In another instance the known racist singled out Mr. Shaw for the way he was wearing

his face shield, but said nothing to white employees who were wearing their shields the same exact way.

25. Plaintiffs Shaw, Kwabena, and Duclion were all privy to racist conversations on the rig. In one particular instance a known racist discussed that he and his family did not celebrate any "nigger's holiday" in reference to Martin Luther King's birthday.

26. Plaintiff Duclion was harassed about his former ex-fiancé, a black woman, by a known racist who said that Mr. Duclion was "alright" even though is fiancé was black.

27. As a white man, Plaintiff Duclion regularly heard white rig employees make negative comments about black employees and typecast them into racially discriminatory stereotypes.

**RETALIATION**

28. Plaintiffs Shaw and Kwabena complained about the racial discrimination in promotions and the racially hostile work environment.

29. Plaintiff Duclion validated Plaintiff Shaw's complaint about racism in promotions and the racially hostile work environment.

30. Defendant threatened Mr. Duclion with "severe disciplinary action" for his involvement in Plaintiff Shaw's complaints. Defendant also told Plaintiff Duclion that he should refrain from participating or involving himself with anything related to Plaintiff Shaw's complaints.

31. Plaintiff Duclion was retaliated against by the rig superintendent when he was denied a promotion he was due and was told that he was not promoted as a result of his involvement in Plaintiff Shaw's complaints about racial discrimination.

32. Similarly, Defendant refused to promote Plaintiffs Shaw and Kwabena despite being promised the promotions following their complaints about racial discrimination.

33. Plaintiffs Shaw, Kwabena, and Duclion were terminated after filing a Charges of Discrimination with the Equal Employment Opportunity Commission.

## VI.    CLASS ACTION ALLEGATIONS

34. The named Plaintiffs bring this action on their own behalf, and on behalf of a class of persons under Rule 23(a), and 23(b)(2) and (b)(3) o the Federal Rules of Civil Procedure.

35. The named Plaintiffs seek to represent a class of:

   **a.** All black persons employed or formerly employed by Defendant in the United States at any time from 2008 to the present, who have been, or continue to be, or may in the future be, adversely affected by Defendant's racially discriminatory employment policies and practices ("the Class"). Plaintiffs reserve the right to amend the definition of the Class following discovery.

36. The individuals in the class are so numerous that joinder of all members is impracticable. Plaintiffs estimate that there are at least 50 of the Class.

37. There are questions of law and fact common to the Class that predominate over any questions affecting only individuals. Among these common questions are:

   **a.** Whether Defendant violated federal civil rights laws, in particular 42 U.S.C. § 1981, and 42 U.S.C. §2000e *et. seq.*;

   **b.** Whether Defendant maintains written and/or unwritten policies and/or practices for performing evaluations that discriminate against the Class on the basis of race;

   **c.** Whether there are statistically significant disparities between the evaluations of black employees and the evaluations of white employees, sufficient to permit an inference of intentional discrimination;

**d.** Whether Defendant maintains written and/or unwritten policies and/or practices for determining promotions that discriminate against the Class on the basis of race;

**e.** Whether there are statistically significant disparities between the promotions awarded to black employees and the promotions awarded to similarly situated white employees, sufficient to permit an inference of intentional discrimination;

**f.** Whether Defendant maintains written and/or unwritten policies and/or practices for determining compensation that discriminate against the Class on the basis of race;

**g.** Whether there are statistically significant disparities between the compensation awarded to black employees and the compensation awarded to similarly situated white employees, sufficient to permit an inference of intentional discrimination;

**h.** Whether Defendant maintains a practice of filling positions without following its written policies on position for positions;

**i.** Whether Defendant fosters and allows a hostile work environment in which black employees are regularly harassed on account of their race;

**j.** Whether Defendant retaliates against those employees who report racial discrimination of black employees;

**k.** If discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the Class and prevent future discrimination against the Class;

**l.** Whether Defendant's conduct constitutes a pattern and practice of discrimination against the Class justifying an award of lost wages, benefits, or other similar relief to individual members of the Class;

m.  Whether Defendant's conduct constitutes a pattern and practice of discrimination against the Class justifying an award of compensatory and punitive damages to individual members of the Class;

38. The claims of Plaintiffs Shaw and Kwabena are typical of the claims of the class. Plaintiffs Shaw and Kwabena allege, *inter alia*, discrimination in promotions and evaluations; Plaintiffs Shaw and Kwabena allege, *inter alia*, discrimination in treatment (hostile work environment) and retaliation; Plaintiff Duclion alleges, *inter alia*, retaliation for engaging in protected activity.

39. The named Plaintiffs will fairly and adequately represent the interests of the Class. The named Plaintiffs have retained skilled and experienced counsel to represent them in class litigation.

40. Defendant has acted or refused to act on grounds generally applicable to the Class, making final and injunctive or declaratory relief appropriate.

41. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

42. Issues common to the Class, as noted above in paragraph number 37, predominate over individual issues.

## VII.  ALLEGATIONS OF CLASS-WIDE DISCRIMINATION

43. Defendant, Helix, has engaged in a continuing pattern and practice of racial discrimination against black employees since 2008, and prior to that date. Defendant discriminates against black employees by (1) maintaining written and/or unwritten policies and practices for performance evaluations of employees that allow biased and inconsistent determinations to the detriment of black employees; (2) maintaining written and/or unwritten policies and

practices that utilize the inherently unreliable results of the evaluation system to make decisions on promotions and compensation; (3) maintaining written and/or unwritten policies and practices for determining compensation that rely on unduly discretionary decisions, resulting in unequal compensation for black employees; (4) maintaining written and unwritten policies and practices regarding promotions, transfers, and other internal hiring practices that allow supervisors to handpick white candidates over highly qualified black candidates; (5) denying black employees equal training, mentoring, and work assignments, preventing them from advancing within the company; and otherwise discriminating against black employees in the terms and conditions of their employment; and (6) failing to monitor and oversee employment and human resources practices and failing to provide adequate oversight of supervisors to ensure that Company policies are applied consistently and in a nondiscriminatory manner.

## VIII.  ALLEGATIONS OF THE INDIVIDUAL NAMED PLAINTIFFS

### FABIAN SHAW'S INDIVIDUAL CLAIMS

44. Shaw began working at Helix on January 19, 2015, as a floor hand, one level up from the lowest position, on the Q5000, an oil drilling rig, stationed off the coast of Singapore.  Of the about 80 total employees on the Q5000, Shaw was one of fewer than 5 black employees.

45. In early 2016, a white employee named Shane Malone was placed on Mr. Shaw's crew as an assistant driller (several levels up from Shaw's position as lead floor hand). This made no sense given that prior to joining Shaw's rig, Malone had previously been a crane operator (a crane operator is the equivalent of a lead roustabout) in another department on the rig. Shaw was clearly better equipped to handle the position of assistant driller.

46. Shaw had to teach Malone how to do his assistant driller role, and took over his duties and responsibilities including being responsible for leading the Job Safety Analyses (JSAs),

47. In late 2016, another white male, Nick Coleman, joined the Q5000 as a roustabout (lowest entry level position). Within one year, Coleman moved from roustabout to rough neck, and up to assistant derrickman while Shaw remained as the lead floor hand for well over 18 months.

48. In October of 2015, when Coleman joined the Q5000, he reposted a picture from the previous year on his Facebook account in which he was holding that read "Good Luck Nigga." Danny Wilson, the rig superintendent was also tagged on the picture.

49. In May of 2017, Mike Haas a white tool pusher on the Q5000 was on Shaw's 28-day hitch. On May 24, 2017, Haas singled out and disrespected Shaw when he kicked a tool toward Shaw. While all floor hands were engaged in the same duties at that time, Haas, who unbeknownst to Shaw at that time, had a history of racist behavior, singled out the one black floor hand to kick tools his way allegedly in an attempt to get him to use those tools. When Shaw ignored his blatantly racist and disrespectful behavior, Haas proceeded to kick the tool toward Shaw *again*. The following day, Haas *again*, insisted on discriminating against Shaw by singling him out about the way in which he was wearing his face shield. *Again*, Shaw had his face shield on exactly like everyone else working in that area at that time, so Haas' comments about the incorrectly worn face shield made little sense.

50. Shaw reported Haas to his immediate supervisor, Dale Duclion, who recommended Shaw go to HR and let them know about the two incidents. Shaw also reported Haas to Danny Wilson, the rig superintendent, as well as the rig manager John McDonald.

51. Several days later, Shaw provided a written statement to Charlie McMullin in HR who said there would be an investigation. HR alleged to have done an investigation but did nothing about the incidents.

52. In August of 2017, Ethan Howard, a white floor hand, was promoted to assistant derrickman, a position that the rig superintendent Danny Wilson had previously promised to Shaw.  Shaw had previously discussed his concerns about the disparate treatment in promotions with the rig superintendent a year before Howard had even joined the rig, and Wilson informed Shaw that he would be promoted to assistant derrickman when an opportunity presented itself. However, it was Howard, a white man, who was promoted to assistant derrickman when a position became available, despite Wilson's promises that Shaw would receive that position.

53. Toby Smith, a driller on the vessel, informed Shaw that Wilson told him that the promotion did not go to Shaw because of the ongoing investigation regarding his complaints about Haas and other white employees.

54. Among the various discriminatory comments that Shaw had to endure, were comments by Smith that Shaw should "go be segregated with Collins [Kwabena]" another black employee and named Plaintiff in this suit.

55. After filing a complaint with the Equal Employment Opportunity Commission and retaining counsel to represent his interests in this matter, Helix, not surprisingly, began promoting black employees in an attempt to combat the years of racial discrimination in evaluations, promotions, and pay. Black employees LaDaryl White, Chris McNight, and Dexter Williams, all lower level black employees on the Q5000 were promoted shortly after the EEOC filings.

### COLLINS KWABENA'S INDIVIDUAL CLAIMS

56. Kwabena began working at Helix on April 6, 2008 as a roughneck, the entry level position on the Q4000, an oil rig stationed off the coast of Louisiana. Of the 144 or so employees on the rig, only about 6 were black. Kwabena remained on the Q4000 from 2008 through 2013.

57. During his time on the Q4000, Kwabena was subject to daily harassment including, but not limited to, racial jokes and jokes about his sexual orientation. It was not uncommon for Kwabena to hear various white members of his crew and other crews on the rig to make use of racial terms such as, nigger. As the only black member of his crew, Kwabena felt very uncomfortable when others regularly used the term nigger.

58. On or around 2012, Kwabena finally spoke up and complained to Robert Hayworth about the inappropriate use of racial slurs. Hayworth promised to investigate the matter, but nothing came of this alleged investigation.

59. Kwabena noticed white employees climbed the rig hierarchy at a much faster pace than black rig employees. It took Kwabena more than 3 years to move from roughneck (the lowest level position) to derrickman (only two levels up from the roughneck position).

60. When Kwabena finally made it to derrickman, he was ostensibly supervising the floorhands and assistant derrickmen under him, but the white employees refused to follow any orders or instructions from Kwabena because he is a black man. Kwabena had to work extra hours doing hard physical labor because the white roughnecks refused to be instructed by a black man. In one instance, Kwabena was struggling to install a lift cap on an IRS (intervention riser system). While the white roughnecks sat and watched Kwabena struggle, Dale

Duclion, an assistant driller, verbally reprimanded the roughnecks, and strapped on a harness himself to help Kwabena.

61. In April of 2013, Kwabena was transferred to the H534. On this rig, as on his previous rig, of the over 140 or so employees, fewer than 10 were black. After 5 years of dedicated employment for Helix, Kwabena had slowly risen in the ranks and become an assistant driller. However, this greatly upset his direct supervisor, a white driller named James Lang who was nicknamed "Peanut." Peanut did not like working with Kwabena, and constantly disagreed with everything Kwabena said or did. Even though Kwabena had significantly more experience in drilling, and should have been a driller long before Peanut, Kwabena was relegated to Peanut's direction. Everything was a conflict for Peanut, who refused to work with a black man who was better versed in the innerworkings of drilling duties. Kwabena recalls one instance in which Paul Baker asked Kwabena why he didn't tell Peanut how to properly handle a specific drilling duty. Kwabena told Baker that he had thoroughly explained to Peanut on numerous occasions how to properly do the task, but that Peanut's racial hatred toward blacks meant that he refused to listen to anything Kwabena had to say.

62. In addition to Peanut being hostile toward Kwabena, a new derrickman (white man) named Caleb Cochran created more division within the crew and turned the crew against Kwabena, making it impossible for Kwabena to supervise his employees. Cochran refused to accept any direction from Kwabena, despite Kwabena being his supervisor. Cochran convinced the crew not to follow Kwabena's lead and insisted on disregarding any instruction that Kwabena issued.

63. Kwabena complained to the tool pusher on the H534, Ryan Terry. Kwabena also complained to the rig supervisor, Paul Baker. Kwabena told Terry and Baker that he wanted to transfer to another rig because he could not imagine continuing to work with Peanut. Kwabena had also heard that Peanut wanted to get rid of him (Kwabena) as the assistant driller in order to replace him with Caleb Cochran.

64. After Kwabena's complaint, a meeting was called to address Kwabena's concerns. Terry, Peanut, Baker, and Kwabena met. During the meeting Peanut openly insisted that Cochran should be the assistant driller, despite Kwabena's experience and qualifications (to include more experience than Peanut himself as the driller. The rig supervisor did nothing to stop Peanut's discriminatory behavior.

65. Kwabena sought to switch crews. Baker told Kwabena that he could temporarily be demoted to derrickman on a different crew. Baker told Kwabena that there was an opening coming up on a new vessel the Q5000 and one of the assistant drillers Jared Comea would be transferred to that vessel as a driller and there would be an opening for him as an assistant driller. Kwabena, knowing he could not continue to work under Peanut's racist direction, was given no other choice but to agree to the demotion, under the promise that he would soon take over Comea's position as assistant driller when Comea transferred to the Q5000. This meant that Cochran, a less experienced and less qualified white man, was promoted on his old crew to assistant driller (Kwabena's position).

66. Paul Baker, the rig supervisor was transferred to the Q5000 shortly after Kwabena's forced demotion, and Baker was replaced by Danny Wilson. When an assistant driller position actually opened up, Danny Wilson did not follow Baker's directions to promote Kwabena. Instead, Danny Wilson promoted a white man named Heston to the open assistant driller

position. As before, this white employee was both less experienced and less qualified than Kwabena. Heston had only recently been hired to work on the rig, and barely understood the inner workings of the H534.

67. In the fall of 2014, a tool pusher by the name of Chris Craig called Kwabena a "nigger" while the men were tripping pipe and Kwabena was operating the bottom racker. The roughnecks instructed to close the jaws on the racking arm, but the racking arm started to close on the pipe. Kwabena stopped the jaws in order to sufficiently grip the pipe. Craig started cursing at Kwabena and called him a "damn nigger." Matthew Smith and Patrick Little were on the floor during this incident and heard Craig use the racial slur.

68. Kwabena complained about the racial slur to the rig supervisor, Danny Wilson. This was not the first complaint Wilson had heard about Craig's behavior. Other crew members, including Eric McCain, Matthew Smith, and Patrick Little also complained about Craig's unprofessional and disrespectful behavior. Wilson allegedly investigated the matter, but nothing was done to address Craig's behavior and he continued to work without facing any disciplinary actions.

69. In April of 2015, Kwabena was transferred to the Q5000 as assistant derrickman. When Kwabena joined the Q5000, he was the only derrickman with experience in Intervention and trained and coached most of the derrickmen with no intervention experience.

70. On July 24, 2017, Kwabena met with the rig superintendent, Danny Wilson. Kwabena told Wilson that he had been assistant derrickman for over two years and very much wanted to be promoted to derrickman. Wilson indicated that as soon as there was an opening for the position, that he would consider Kwabena. Less than a month later, a white assistant derrickman with significantly less experience was promoted to derrickman.

71. In late August 2017, Kwabena was again bypassed for a promotion when a white assistant derrickman was promoted to derrickman (over Kwabena). Kwabena complained to rig superintendent, Minton, that he did not feel comfortable and safe working in such a racially discriminatory environment and needed some time off.

72. Kwabena also faced a hostile work environment in which white employees told Shaw to "go be segregated with Collins [Kwabena]."

73. Kwabena had faced more racial discrimination than he could take, and on September 5, 2017, Kwabena complained in writing about the racial discrimination in promotions that he faced while working for Helix. He also proceeded to request time off, but was denied short term disability and was retaliatorily terminated for complaining about the many years of racism that he faced working for Helix.

**D**ALE **D**UCLION'S **I**NDIVIDUAL **C**LAIMS

74. Duclion began working at Helix on August of 2007 as a roustabout, the entry level position on, the Q4000, an oil rig stationed off the coast of Louisiana. Shortly after being hired, a black employee, Plaintiff Kwabena was hired to work on the Q4000. Immediately after Kwabena was hired, Duclion noticed persistent racial discrimination against Kwabena.

75. Duclion recalls Kwabena being harassed by nearly every white crew member, including the driller, the assistant driller, and all of the roughnecks. In one particular instance, Duclion noticed Kwabena having difficulty doing a two-man job by himself. Instead of any of the white roughnecks doing their job and helping Kwabena, they simply sat and watched him struggle. Duclion, who at the time was an assistant derrickman, had to leave what he was, put on a harness and help Kwabena. The other white roughnecks simply sat

and watched and made vulgar racist comments, such as "you telling me you can't do that all by yourself pussy black motherfucker."

76. Kwabena informed Duclion that the behavior he witnesses was "standard operating procedure" for his work and daily interactions with the white crew members.

77. On a separate occasion, the vessel (rig) was hit by a supply boat, which ended up violently shaking the vessel. Two black employees on the rig, fearing danger, ran for cover and safety. Robert Hayworth, a white tool pusher, said "that's the fastest them two niggers ever moved." Duclion told Hayworth that his words were inappropriate, and should he continue such racism that it would cost him his job.

78. In late 2014, Duclion made a lateral move as an assistant driller to a new rig, the Q5000. There he heard similar racially discriminatory comments. One white employee, Mike Haas, would regularly tell the story of his daughter coming home from school and discussing preparations for Martin Luther King Day the following school day. Haas told his daughter she needed to return to school and tell her teacher that she did not celebrate "no nigger's holiday" and they [Haas and his family] celebrated Robert E. Lee's birthday. Everyone on Haas crew was well acquainted with this story, to include his superiors, who Duclion personally heard Haas tell the story to numerous times. Steve Ban Buren and Brandon West were among the many white employees who Duclion can attest, Mr. Haas told this story.

79. Duclion also noticed Haas constantly make negative comments about black employees. For example, Haas made use of black stereotypes and make racially discriminatory jokes about black employees, such as talking about blacks and gold teeth. Everyone knew Haas was racist, and several people believed that one day he would be terminated for his inappropriate racist behavior.

80. Duclion remembers one incident where he disclosed his discomfort with Haas' racism by informing Haas that his ex-fiancée was black. Duclion told Haas "you know my ex-fiancée is black right?" to which Haas promptly responded, "yeah, but you're alright though." Haas indication that being black was something "defective" or something to be disliked, troubled Duclion who was very frustrated by the ongoing racism at Helix since he started his employment there in 2007.

81. In early 2017, Duclion was forced to switch crews. When Duclion was put on Toby Smith's crew, he noticed that another black employee, Plaintiff Shaw (known on the crew as "Fabo"), faced increasing racism from white employees, specifically Michael "Mik" Hewitt.

82. Toby Smith, the driller, would approach Shaw for help, despite being Shaw's superior because he did not want Duclion to know that he could not handle the job. Shaw had been carrying the entire crew for months, and was the only crew member who could handle every operation.

83. Duclion and Smith both noticed Mik Hewitt being overly aggressive toward Shaw. In February of 2017 both men saw Hewitt unnecessarily snatch paperwork out of Shaw's hands and become very irate with him when Shaw asked if he could take some paperwork to the office with him since Hewitt was headed there anyway. In another instance about a month later in March of 2017 Duclion was informed that Hewitt yelled at Shaw because Shaw took his break in the crane office.

84. In March of 2017, Duclion reported Hewitt to the rig superintendent, Danny Wilson. Specifically, Duclion reported the racism that he had witnessed from Hewitt against black employees. Duclion told Wilson that Hewitt was treating Shaw poorly because "Fabo is

black." Despite, Wilson insisting "we can't have that on our rig," nothing was done to address the discrimination.

85. Duclion also witnessed other white employees follow suit and engage in racially discriminatory behavior against Shaw and other black employees. Haas, for example, went into the drill shack and started talking about how black employees from the galley wanted to make their way to working on the rig as roustabouts. Haas said, "but it's already too many of them as it is, if you know what I mean." Duclion responded with: "it sounds like you're talking about a class action [lawsuit]."

86. In May of 2017, Duclion *again* sought to report racist and discriminatory behavior. This time Duclion reported that Mike Haas was engaged in racist and discriminatory behavior to Captain Loebel. Captain Loebel urged Duclion to "let this go." Captain Loebel said "try not to push this any further, this will cause more harm than good. Captain Loebel went on to say that Superintendent Dave Minton had just "gotten out of an investigation like this because he said some extremely racist shit to African American women in particular."

87. That same evening Duclion reported Haas to Captain Loebel, and immediately it was evident that he was facing retaliation from his superiors, including his direct supervisor, Toby Smith. On May 27, 2017, Smith approached Duclion and had a conversation with him about how "everyone is racist" and that Duclion could not understand that yet because he did not have children.

88. On August 18, 2017, Duclion was called into the Houston office by John McDonald, Rig Manager, Charlie McMullin in HR, and Kenric McNeal the Corporate HR Manager. Duclion was effectively threatened with his job should he continue to pursue and defend Shaw's claims of racism. Duclion was informed that "none of this was any of his business"

and that his involvement "messed everything up." The three men also told Duclion that should "this happen again [meaning should he stand up for black employees facing disclination], and should [he] involve [himself] in anything that does not pertain to [him], [he] would face severe disciplinary action."

89. The three men also insisted about Haas' behavior could be interpreted differently, that it was possible that coworkers could have lied in favor of Haas. They also noted that it is *not* illegal to be racist. Finally, Duclion was told that should Shaw decide to pursue anything further regarding his claims of discrimination, that Duclion should "leave him alone" as there was "no need to get further involved."

90. On August 23, 2017, Toby Smith informed Duclion that Wilson, the Rig Superintendent, informed him that despite there being room for promotions and "movements" within the rig, that Duclion's crew, including Shaw, would not receive any promotions due to the reports of racial discrimination and harassment.

91. Duclion faced further retaliation when Matthew Sharp was promoted over him. Smith told Duclion that Danny Wilson's failure to promote him was due to his "involvement in Fabian Shaw and Michael Haas' case."

## IX.    CAUSES OF ACTION

### COUNT 1 – DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF §1981

92. Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

93. The Civil Rights Act of 1866 prohibits discrimination against an individual because of that individual's race. See 42 U.S.C. §1981.

94. Pursuant to 42 U.S.C. §1981 Plaintiffs Shaw and Kwabena plead a cause of action against Defendant, Helix, for racial discrimination.

95. Defendant Helix intentionally discriminated against Plaintiffs, Shaw and Kwabena, and the Class in violation of § 1981 by a pattern and practice of (1) giving black employees lower evaluations than white employees on the basis of race; (2) denying promotions to qualified black employees on the basis of race; (3) paying black employees less than similarly situated white employees; and (4) denying black employees equal terms and conditions of employment.

**COUNT 2 – RETALIATION AGAINST THE NAMED PLAINTIFFS IN VIOLATION OF § 1981**

96. Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

97. The Civil Rights Act of 1966 prohibits retaliation against an individual who engages in protected activity. See 42 U.S.C. §1981.

98. Pursuant to 42 U.S.C. §1981 Plaintiffs Shaw, Kwabena, and Duclion plead a cause of action against Defendant, Helix, for retaliation.

99. Plaintiffs Shaw, Kwabena, and Duclion engaged in protected activity when they reported racial discrimination on the rig based on protected traits.

100.    Plaintiff Shaw's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Shaw after he reported racial discrimination.

101.    Plaintiff Kwabena's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Kwabena after he reported racial discrimination.

102.    Plaintiff Duclion's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Duclion after he validated the claims of Plaintiff Shaw and reported the racial discrimination of black employees.

## COUNT 3 – DISCRIMINATION AGAINST NAMED PLAINTIFFS, SHAW AND KWABENA IN VIOLATION OF TITLE VII

103.    Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

104.    The Civil Rights Act of 1964 prohibits employers from discriminating against employees because of that individual's race. See 42 U.S.C. §2000e *et seq.*

105.    Pursuant to 42 U.S.C. §2000e *et seq* Plaintiffs Shaw and Kwabena plead a cause of action against Defendant, Helix, for racial discrimination.

106.    Defendant Helix has intentionally discriminated against Plaintiffs Shaw and Kwabena in violation of 42 U.S.C. §2000e *et seq.* by (1) denying Shaw and Kwabena promotions on the basis of race; (2) paying Shaw and Kwabena less comparable to white employees on the basis of race; (3) denying Shaw and Kwabena equal terms and conditions of employment.

## COUNT 4 – RETALIATION AGAINST THE NAMED PLAINTIFFS IN VIOLATION OF TITLE VII

107.    Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

108.    The Civil Rights Act of 1964 prohibits retaliation against employees who engage in protected activity. See 42 U.S.C. §2000e *et seq.*

109.    Pursuant to See 42 U.S.C. §2000e *et seq.* Plaintiffs Shaw, Kwabena, and Duclion plead a cause of action against Defendant, Helix, for retaliation.

110.    Plaintiffs Shaw, Kwabena, and Duclion engaged in protected activity when they reported racial discrimination on the rig based on protected traits.

111.     Plaintiff Shaw's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Shaw after he reported racial discrimination.

112.     Plaintiff Kwabena's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Kwabena after he reported racial discrimination.

113.     Plaintiff Duclion's protected activity eventually resulted in his termination based on pretext. Helix terminated Plaintiff Duclion after he validated the claims of Plaintiff Shaw and reported the racial discrimination of black employees.

**COUNT 5 - VIOLATIONS OF TITLE VII – HOSTILE WORK ENVIRONMENT**

114.     Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

115.     The Civil Rights Act of 1964 prohibits employers from harassing employees because of that individual's race. See 42 U.S.C. §2000e *et seq.*

116.     Pursuant to 42 U.S.C. §2000e *et seq* Plaintiffs Shaw and Kwabena plead a cause of action against Defendant, Helix, for race based hostile work environment.

117.     Defendant Helix engaged in harassment against Plaintiffs, Shaw and Kwabena, black employees by creating a racially hostile work environment.

118.     Similarly situated white employees did not experience the continued harassment and discrimination that Plaintiffs Shaw and Kwabena experienced.

119.     The effect of these practices was to terminate Plaintiffs Shaw and Plaintiff Kwabena from Helix.

**COUNT 6 – RACIALLY DISPARATE IMPACT IN VIOLATION OF TITLE VII**

120.     Plaintiffs reassert and incorporate by reference all of the above numbered paragraphs.

24

121.     Defendant's policies and practices for determining compensation including the use of Defendant's performance evaluation system as a basis for determining compensation have a disparate impact on black employees.

122.     Defendant's policies and practices for determining promotions and job transfers, including the use of Defendant's performance evaluation system as a basis for determining advancement, have a disparate impact on black employees.

## X.     JURY DEMAND

123.     Plaintiffs request a trial by jury on issues triable by a jury in this case.

## XI.     DAMAGES

124.     Plaintiffs are entitled to an award of actual and compensatory damages in an amount that exceeds the minimum jurisdictional limits of this Court. These include their past and future loss of higher wages, raises, and or bonuses. Plaintiffs also seek an award of damages for their mental anguish and the losses they have suffered and continue to suffer.

125.     Further, because the Defendant's acts and omissions were committed with malice and/or with reckless disregard of the consequences, they justify the imposition of exemplary damages in addition to the compensatory damages to which Plaintiffs are entitled. A reasonable amount for exemplary damages in this case should take into consideration the need to deter future conduct of this type.

126.     Plaintiffs also seek compensation for the out of pocket expenses, attorneys' fees, and costs of Court they will have incurred in this action.

127.     Plaintiffs believe that a jury should put a dollar value on these damages after it hears the evidence.

## XII.     PRAYER

128.    For these reasons, Plaintiffs Shaw, Kwabena, and Duclion and the Class pray that Defendant, Helix, be cited to appear and answer herein and that this case be advanced for trial before a jury, and that on final hearing this Court grant the following relief:

a.    Certify this case as a class action;

b.    Enter a judgment that Defendant's acts and practices as set forth herein are in violation of the laws of the United States;

c.    Enter preliminary and permanent relief enjoining the discriminatory conduct necessary to end Defendant's discriminatory practices and prevent current and future harm to the Plaintiffs and the Class.

d.    Award Plaintiffs and the Class lost wages, including back pay, front pay, and lost fringe benefits, and including without limitation, any lost benefits that Plaintiffs and the Class would have otherwise received but for the discrimination;

e.    Award Plaintiffs and the Class compensatory and punitive damages;

f.    Award Plaintiffs the cost of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

g.    Grant Plaintiffs and the Class such other and further relief at this Court finds necessary and proper.

Respectfully Submitted,
TB Robinson Law Group, PLLC

Terrence B. Robinson, Attorney-In-Charge
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Laura A. Hernandez

*26*

Fed. Bar No. 24100107
Texas Bar No. 2935637
Email: LHernandez@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFFS**